[PHILADELPHIA, 1839.]

## ESTATE OF WILLIAM TILGHMAN, Esq.

APPEAL.

1. By an agreement in consideration of an intended marriage, the portion of the wife was to be raised out of her real estate, of which her father was tenant by the curtesy, by a sale after she should arrive at the age of twenty-one years. The marriage took place : the wife attained the age of twenty-one, and died two months afterwards, without any act having been done by her for the purpose of sale, or any request by the husband to the father to that effect : *Held*, that the estate of the father was not liable for the non-performance of the agreement.

2. By a private act of the legislature, W. T. who was tenant by the curtesy of certain town lots and lands, was authorised to sell the lots in fee, provided that there should be reserved a perpetual ground-rent of at least two dollars per annum, issuing out of and charged on every lot sold, to be paid to the said W. T. during his life, with remainder in fee to the heirs of his deceased wife. Under this power W. T. sold divers lots, on which he reserved ground-rents in the manner prescribed by the act, and for which also he received gross sums in money in addition : *Held*, that these sums were to be considered as real estate, and as such, went to the heirs of his deceased wife, and not to the administrator of a daughter who died in his lifetime.

3. Where the proceeds of the sale of real estate sold by executors, under authority contained in a will, have been paid into the Orphans' Court, in pursuance of the 19th section of the act of 24th February, 1834, that Court has jurisdiction over the fund, and power to adjudicate the right of a person claiming as a creditor of the testator.

THIS was an appeal by Benjamin Chew, Jr., Esq., from a decree of the Orphans' Court for the county of Philadelphia, in the matter of the settlement of the accounts of Edward Shippen Burd, executor of the will of William Tilghman, Esq., deceased.

The appellant's deceased wife, Elizabeth Margaret Chew, was the only child of the testator and of his deceased wife, Mrs. Margaret Tilghman, who was one of the daughters of James Allen, son of William Allen.

Before 1765, this William Allen was proprietor of three thousand three hundred and seventy acres of land in Northampton county. In or about that year, he laid off the town of Northampton upon part of this land, and sold many lots in it, reserving small ground rents. On the 5th of January, 1767, he conveyed the whole of this Northampton estate to his son James (the above-named father of Mrs. Tilghman) in fee. William Allen survived his son James, and died on the 6th of September, 1780. By his will, made during James's

lifetime, he had devised to him one-fourth of his residuary estate, and by a codicil made after James's death, had devised this one-fourth of his residuary estate to James's four children; who were James, the younger; Ann (afterwards Mrs. Greenleaf;) Margaret (afterwards Mrs. Tilghman;) and Mary (afterwards Mrs. Livingston:) viz., one-half of the one-fourth of the residue to James the younger, and the other half of it among his three sisters.

His residuary estate is described in the act of 1799 mentioned below, as " consisting of a number of tracts of land situated at a considerable distance from each other, which were liable to considerable and unavoidable injury from destruction of timber and other circumstances." Of course it embraced no part of the Northampton estate, as this had been previously conveyed to the testator's son James.

James Allen, the son, the proprietor of the Northampton estate, died in 1778 or 1779, leaving a widow Elizabeth (afterwards Mrs. Lawrence,) and issue the four children above-named. During his lifetime, he had conveyed away on ground-rent a large number of the town lots in Northampton, and about six hundred and seventy acres of the lands adjoining the town; and for many of the town lots had given tickets or executory contracts for the disposal of them on certain conditions.

By his (James Allen's) will dated 23d May, 1778, he devised to his daughter Margaret (afterwards Mrs. Tilghman,) about four hundred acres (the part remaining unsold of about five hundred acres) of one of his tracts in Northampton county, adjoining the then town of Northampton, including part of the present borough of that name, and some real estate in Philadelphia; to his son James, the younger, between nine hundred and one thousand acres in Northampton county, including the town and rents theretofore reserved; the rest of the Northampton estate in specific parcels to each of his two other daughters—the whole subject to a provision in favour of his widow; the residue among his four children equally.

James Allen the younger, son of James, died in his minority, unmarried and intestate, whereupon his estate descended to his three sisters.

Of these sisters, Margaret, who had married the testator, William Tilghman, gave birth in April, 1796, to a daughter, Elizabeth Margaret, afterwards Mrs. Chew.

By two deeds of 3d April, 1798, Mr. and Mrs. Tilghman conveyed in fee to Samuel Davis, who reconveyed to Mr. Tilghman and *his* heirs the tract of four hundred acres specifically devised to Mrs. Tilghman in her father's will.

On the 17th of May, 1798, a deed of partition was made between

Ann Penn Allen, (afterwards Mrs. Greenleaf) of the first part; William Tilghman and wife of the second part; and Mr. and Mrs. Livingston of the third part; ascertaining with precision the boundaries of the parcels of the Northampton estate, which their father had left to them respectively in severalty, and dividing and allotting in severalty, what they held in common as heirs of their brother James.

What was ascertained and allotted by this deed as the property in severalty of Mrs. Tilghman and her heirs, is what is termed "the Northampton Estate," in the writing of the 10th of July, 1816, hereinafter mentioned.

In 1798 or early in 1799, Mrs. Tilghman died, leaving her husband tenant by the curtesy of this estate; the reversion and inheritance descending to her daughter. The same thing occurred with respect to other real estate mentioned below.

On the 3d of April, 1799, the legislature passed " An act for the benefit of Elizabeth Allen and Elizabeth Margaret Tilghman," in the following words:

" Whereas it hath been represented to the legislature by the petition of Andrew Allen as guardian for his daughter Elizabeth Allen, William Allen, Ann Penn Allen, William Tilghman, Henry Walter Livingston and his wife, and others residuary devisees of William Allen, formerly of the city of Philadelphia, deceased, that the said William Allen deceased, devised the residue of his estate to four different branches of his family, to be held by them as tenants in common, in the several proportions mentioned in the last will and testament of the said William Allen, and the codicil thereto; that the residue of the said estate consists of a number of tracts of land situate at a distance from each other, which are liable to considerable and unavoidable injury from the destruction of timber and other circumstances; that it would be much for the interest of all persons concerned, and it is their desire that the residue of the said estate should be sold; but an advantageous sale thereof cannot be made on account of the infancy of the said Elizabeth Allen and of Elizabeth Margaret Tilghman, the only child of the said William Tilghman and his late wife Margaret Elizabeth, deceased, who was one of the daughters of James Allen, deceased; and the said petitioners prayed that an act might be passed authorising such person as to the legislature should seem proper, to sell and convey on behalf of the said Elizabeth Allen, her undivided share of the estate devised to her as aforesaid by her grandfather William Allen; and authorising the said William Tilghman to sell and convey on behalf of his said child all her interest in the said residuary estate of the said William Allen deceased therefore."

[Sections I. II. and III. relate to the estate of Elizabeth Allen.]

" Section IV. And be it further enacted by the authority afore-

said, that the said William Tilghman shall be and he is hereby authorised to sell and convey in fee simple for such price, in such manner, and on such terms as he shall think most advantageous, all that part of the residuary estate of the said William Allen, deceased, to which his said late wife was entitled, and whereof the said William Tilghman is now seized of an estate for term of his life as tenant by the curtesy with remainder to his said child; and the contracts, sales, conveyances and receipts for purchase-money to be made and given by the said William Tilghman touching the premises shall be valid and effectual against all persons claiming or to claim under his late wife : provided always, and it is hereby enacted, that the heirs, executors, or administrators of the said William Tilghman shall pay to his said child, or in case of her death before she arrives at the age of twenty-one years to such person or persons as would have been entitled to the said estate if it had remained unsold, the full amount of the sum for which the said William Tilghman shall sell the same.

Section V. And whereas the said William Tilghman is seized for life as tenant by the curtesy, with remainder in fee simple to his said child, of part of the town of Northampton in the county of Northampton, and of land adjoining the said town, and it will be a benefit both to the public and to the said William Tilghman and his said child that the lots already laid out in the said town, or which may be laid out on land adjoining thereto, should be conveyed to such persons as may be willing to purchase the same in fee simple, reserving an annual ground-rent charged thereon as has been usual : and whereas it appears by petition of the said William Tilghman that James Allen aforesaid, deceased, during his life, and after his death his widow and children, made divers contracts for the sale of lots in the said town, some of which have been complied with by the purchasers, and others may be hereafter complied with, but there is no person now authorised to complete the titles of the purchasers of such of the said lots as lie within that part of the said town which belonged to the late wife of the said William Tilghman. Be it therefore enacted by the authority aforesaid, that the said William Tilghman shall be and is hereby authorised during the minority of his child to sell and convey in fee simple to such persons as he shall think proper, any lots lying within the aforesaid part of the said town of Northampton, or to be laid out on lands of which he is seized as aforesaid, adjoining the said town : provided that there be reserved a perpetual annual ground-rent of at least two dollars, issuing out of and charged on each lot, to be paid to the said William Tilghman for his life, with remainder in fee simple to the heirs of his said late wife ; and that the said William Tilghman shall be authorised, and is hereby authorised during the minority of his said child to convey in fee simple, according to the terms of the several contracts made as aforesaid by the said James Allen or his widow or

children, such lots within the aforesaid part of the said town as have been contracted for as aforesaid, to those purchasers who have already complied with or shall hereafter comply with their contracts; and that all conveyances to be made by the said William Tilghman as aforesaid, shall be as valid and effectual as if his said child was of full age and a party to the said conveyances; but shall have no greater validity or effect whatever."

Of the 400 acres held by the testator in his own right under the deed from Davis, he sold sundry portions, and retained other portions till his death.   He also acquired in his own right by subsequent purchases, the ownership of lots and lands in and out of the borough; some of which he disposed of on ground-rent, some for cash, and others partly for cash and partly on ground-rent; other portions remained undisposed of at his death, and passed by his will, as has been stated, to the two sisters of Mrs. Tilghman.

During his daughter's lifetime, several of the town lots of which the testator was tenant by the curtesy with reversion to her in fee, were disposed of by him under the power contained in the fifth section of the above mentioned act of the 3d of April, 1799.   In the articles of agreement with the purchasers of such lots, the whole consideration was, in some cases, payable in the shape of a ground-rent, reserved out of the lot, while in other cases it was payable partly in this shape, and partly in a gross sum or pecuniary foregift payable by instalments.   Articles, or references to articles of agreement of this sort, in all twenty-two in number, were produced in evidence in the Court below, by which it appeared, that contracts for such pecuniary prices, over or above the amounts of ground-rent reserved, had been made by the testator, to the amount of—according to one calculation—six thousand eight hundred dollars, and according to another calculation, seven thousand two hundred dollars; on account of which he had received during his lifetime, as it was said, between four thousand and five thousand dollars.

· Before the marriage of his daughter, the testator contracted for the sale of certain real estate, situate elsewhere than in Northampton county, of which she was seized in fee subject to his curtesy estate, viz.

| | | |
|---|---|---|
| 1799, Feb. 20. Farm in New Jersey, to A. Grandine, | $3000 | 00 |
| 1802, Feb. 31. Lot in Chesnut st. Phila. to G. Fox, | 2667 | 67 |
| 1804, Feb. 13. Farm in Bucks county, to Flack, | 4000 | 00 |
| Total consideration of these sales, | $9666 | 67 |

They were made with the testator's guarantee, that his daughter should confirm them on her arrival at twenty-one.

To carry into effect a family understanding, Chief Justice Tilghman shortly after the death of his mother-in-law in 1799, undertook that his daughter should release to a half-sister of her mother, one-sixth of a farm in New Jersey, called Longbridge.

The marriage of Mr. and Mrs. Chew took place on the 11th of July, 1816. On the preceding day, writings had passed between the testator and the appellant, of the following tenor, viz.:

"The disposition which I wish to make of the estate of Elizabeth M. Tilghman, as it shall become subject to my disposal, is as follows:

The law shall take its course with all land which may belong to her, except in case of no issue *surviving her*, when I renounce the tenancy by the curtesy.

If I should survive her, I renounce my legal right to her personal property, except issue shall survive her also.

All property will be included in the above two sections, which is considered as *capital* belonging to her estate.

These two provisions to take effect in case of the subsequent death of issue which may have survived her.

To give *full* power of making a writing testamentary, which may dispose of every part of her estate, except issue survive her, when the disposition shall not be to their disadvantage.

It being always understood that, during the coverture, my control over all the estate is to be bounded by the law only, and that this arrangement is not to be considered as extant until the moment when its provisions are to take effect, and then my own estate shall be answerable for them.

The law provides for the distribution of my estate; at least the advantages it gives her shall be fully preserved to her.

Finally, no debts of mine shall affect her estate, which shall have priority to all other claims upon my property.

Done 10th of July, 1816, at Philadelphia.

                                        B. CHEW, JR."

(Endorsed.) "10th July, 1816—B. Chew, Jr.'s proposals to W. Tilghman, respecting his daughter's property.

Mem.—Instead of these proposals, W. T. drew others more favourable to Mr. Chew, which were assented to by Mr. Chew. These writings are dated July 10th, 1816."

                        "Philadelphia, July 10th, 1816.

My Dear Sir: As my daughter, to whom you are to be married, is under age, I think proper to mention what I propose to be done after she arrives at twenty-one; and from the conversation we have recently had, I make no doubt but it will be agreeable to you. In order to procure an income, we must resort to the Northampton estate, which, although valuable, is unproductive in its present state.

(Estate of William Tilghman, Esq.)

I intend, that so much of it shall be sold, as will produce thirty thousand dollars, of which five thousand may be expended in furniture, and the remaining twenty-five thousand placed in your hands, to be used by you as you think proper. This capital of twenty-five thousand dollars, is to be considered, after your death, as a debt due from your estate. If your wife survives you, she is to receive it from your estate; and if she dies before you, she is to have the right of disposing of it as she pleases, either by last will and testament, or any writing in nature thereof, or any other writing executed in the presence of at least two witnesses, during her coverture; but if she should die, without making any such disposition, then, after your death, the said twenty-five thousand dollars is to be distributed according to the law of Pennsylvania, in the same manner as it would be, if your wife had died possessed of it, and unmarried: Provided, that if it should be made to appear, by any books, writings or papers of yours, in what property, real or personal, the said twenty-five thousand dollars stand invested at the time of your death, then instead of that sum being considered as a debt against your estate, the specific property shall go to your wife, if she survives you, absolutely, or, in case she dies before you, be subject to her disposition as aforesaid; and if she makes no disposition thereof, it shall descend, or be distributed, according to its nature, in the same manner as if she had died seized or possessed of it and unmarried.

I am, dear sir,

Very sinc'y and aff'y yours,

Wm. Tilghman."

To Benjamin Chew, Jr., Esq.

"The above proposals are perfectly agreeably to me, and I engage to do anything necessary on my part for carrying them into effect.

B. Chew, Jr.

William Tilghman, Esq.
July 10th, 1816."

(Endorsed.) "10th July, 1816.—W. Tilghman's proposals respecting his daughter's property, to B. Chew, Jr., and Mr. Chew's assent to the same."

The following paper was given in evidence by Mr. Chew, the appellant, before the auditor of the Orphans' Court.

"Mem.—Aug. 16, 1816.—I this day showed to B. Chew, Esq., the writing signed by his son Benjamin and myself, July 10, 1816, respecting the disposition of my daughter's fortune, and he approved of it. I then mentioned to Mr. Chew, that my intimacy with him, and confidence in his integrity, had rendered it unnecessary for me to enter into any thing like a contract with him, concerning the

estate to be given by him to his son. But that I took for granted, that in case of his son's death leaving issue by my daughter, he would make the same provisions for his son's family by his will, which he would have made for his son himself in case he had survived his father. Mr. Chew declared this to be his settled intention —that justice required, that the issue should stand in the place of the parent, and his own father had acted on that principle in making his will; and he himself should certainly do the same.

W. T."

(Endorsed.) "16th of August, 1816. Mem. of a conversation between W. T. and B. Chew, Esq., respecting provision for his son's family in case he should die in his father's life, leaving issue."

During the eleven months after the marriage that Mrs. Chew lived, the testator expended in purchasing furniture for her $280 73, and gave to Mr. Chew, in order to pay for furniture, other sums amounting to $2,288.

Mrs. Chew came of age in April, 1817, and lived until the 10th of June of that year. During the month of May, she and Mr. Chew executed a deed, carrying into effect, in favour of her relative, the above-mentioned family arrangement, respecting Longbridge Farm. They also, in the same month, executed a deed, in confirmation of the conveyances to Grandine, Fox and Flack, for the above-mentioned items of property, purchased by them respectively during her minority. In discharge of Mr. and Mrs. Chew's claim, therefor, the testator gave Mr. Chew a bond for ten thousand dollars, payable within one year from his decease, the amount of which was retained out of the first assets of the estate, by Mr. Chew, during his executorship.

During the period which elapsed between Mrs. Chew's arrival at full age, and her death, no steps were taken by either Mr. or Mrs. Chew, to carry into effect the purposes expressed in the writing of the 10th of July, 1816, nor did it appear in evidence that any application or request was ever made by them or either of them, to Chief Justice Tilghman, to unite with them in any such measure. She died on the 10th of June, 1817, without any such measure having been adopted, leaving one child, William Tilghman Chew, to whom her reversion in the property descended, to take effect in possession on the death of Ch. J. Tilghman, whose outstanding curtesy estate prevented any curtesy estate present or expectant from vesting in Mr. Chew.

On the 23d of March, 1818, an act of the legislature was passed, in the following words:

"*An Act to enable William Tilghman to sell and convey certain real estate.*

Whereas, it has been represented to the legislature by the petition

(Estate of William Tilghman, Esq.)

of William Tilghman and Benjamin Chew, junior, both of the City of Philadelphia, that the said William Tilghman is seized for term of his life, as tenant by the curtesy, of one-third part, ascertained by metes and bounds, of the land within the borough of Northampton, in the county of Lehigh, and of about four hundred acres of other land, part adjoining, and the rest near to said borough, the reversion in fee simple of all which lands, is vested in his infant grandson William Tilghman Chew, the only child of the said Benjamin Chew, junior, and his late wife Elizabeth Margaret Chew, deceased, who was the daughter and only child of the said William Tilghman, and that it would be for the benefit of all parties concerned, as well as of the inhabitants of the said borough, that the said William Tilghman should be authorised during the infancy of his said grandson, to sell and make conveyance in fee simple of lots in the said borough, to such persons as should be disposed to erect buildings thereon, having regard at the same time to the interest of the said infant or in case of his death, of such person or persons as may be entitled to the reversion, at the time of the death of the said William Tilghman; and the said petitioners prayed that an act might be passed, authorising the said William Tilghman, during the minority of his said grandson, to sell and convey in fee simple on such terms as he may think advantageous, any lots or parcels of land lying within that part of the said borough whereof he is seized for life as aforesaid, to such person as shall engage to erect buildings on the same, and providing at the same time, for the interest of the reversioner in the manner set forth in the said petition.

Sec. 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That the said William Tilghman shall be and is hereby authorised during the minority of his said grandson William Tilghman Chew, to sell and convey in fee simple, on such terms as he shall think advantageous, any lots or parcels of land lying within that part of the said borough of Northampton, whereof he is seized for life as aforesaid, to such persons as shall engage to erect buildings on the same: Provided, that the principal of all moneys which shall be received by the said William Tilghman in consequence of such sales, shall be paid by his heirs, executors or administrators, immediately after his death, to such person or persons as would upon his death have been entitled to such lots or parcels of land in case the same had not been sold; and if there shall be any uncollected balances due from the purchasers, the same shall be collected by the executors or administrators of the said William Tilghman, and paid over to the person or persons who would have been entitled to the land as aforesaid. And provided also, That if the said William Tilghman Chew, shall survive his said grandfather, William Tilghman, and then die under the age of twenty-one years, in that case the principal of all the said moneys

shall go over and be paid to such person or persons as would have been entitled to the said lots or parcels of land at the death of the said William Tilghman Chew, if the same had remained unsold.

Section 2. And whereas it was also represented by the said petitioners that James Allen, deceased, the former proprietor of all the land within the borough of Northampton aforesaid, and after his death his widow Elizabeth Allen, also deceased, or the children of the said Elizabeth and James Allen, made divers contracts for the sale of lots within the said borough, some of which contracts have been complied with by the purchasers, and others may be hereafter complied with, but there is no person now authorised to complete the titles of the purchasers of such of the said lots as lie within that part of the said borough of which the said William Tilghman is seized for life as aforesaid, and the said petitioners prayed that the said William Tilghman might be authorised during the minority of his said grandson William Tilghman Chew, to complete the titles aforesaid.

*Be it therefore enacted by the authority aforesaid,* That the said William Tilghman shall be and is hereby authorised during the minority of his said grandson, to convey in fee simple according to the terms of the several contracts made as aforesaid, either by the said James Allen in his life, or after his death by his widow Elizabeth Allen, deceased, or by the children of the said James and Elizabeth Allen, such lots within the aforesaid part of the said borough, as have been contracted for as aforesaid, to those purchasers, their heirs or assigns, who have already complied with, or may hereafter comply with their contracts: Provided, That all conveyances to be made by the said William Tilghman by virtue of this act, shall be as valid and effectual as if his said grandson, William Tilghman Chew, was of full age and a party to the said conveyances, but shall have no greater validity or effect whatever; and that before any exercise of the powers conferred by this act, the said William Tilghman shall give bond with sureties to the satisfaction of the Orphans' Court for the county of Philadelphia for the faithful discharge of the duties herein required."

On the 10th of May, 1818, Chief Justice Tilghman endorsed upon the writing of the 10th of July, 1816, the following:

" Mem.—May 10th, 1818. The settlement intended to have been made, of part of my daughter's estate, was prevented by her unfortunate death, soon after she came to the age of twenty-one. The land which was to have been sold, with her concurrence, cannot now be sold, as the reversion, after my death, is vested in her infant son. Mr. Chew, however, will receive ten thousand dollars on my death, being the amount of a bond which I gave to my daughter, in consideration of her releasing to me, her interest in certain parts of her real estate.

WM. TILGHMAN."

(Estate of William Tilghman, Esq.)

On the 22d of August, 1818, Chief Justice Tilghman addressed to Mr. Chew the following letter.

" Philadelphia, 22d Aug., 1818.

My Dear Sir :

It was my wish, as I have often told you, to take upon myself the future expense of maintaining and educating my grandson, but you are of opinion that this would be attended with inconvenience. I have therefore determined to give you possession of the farm in Lehigh county, now in the occupation of my tenant Peter Walpman, together with my share of the crop of this year, the best that ever was made there. You are to pay me a rent of one dollar yearly on the 1st day of January, *if demanded,* pay the taxes, keep the buildings and fences in good order, and suffer no waste to be committed in the woodland. You may have the farm during my life, subject to the following conditions :—1st, as every thing in this world is uncertain, it may happen that hereafter I may find it expedient to reside, at least during the summer season, in Lehigh county. In such case, I am to have the right of resuming the possession of any part or the whole of the farm ; but if the child shall be living and you shall still desire that he should receive his support immediately from yourself rather than me, I will pay you by way of equivalent, as much as in the opinion of judicious men would be a fair rent for the farm. 2d. If (which God forbid) the child shall die, I shall stand in a very delicate situation with respect to the estate in Lehigh county, and therefore must reserve the right of doing with this farm, what upon reflection it shall appear to me that justice and prudence may require. But in all events I shall be disposed to conduct myself towards you with kindness and liberality.

I am affectionately yours,

WM. TILGHMAN."

Benjamin Chew, Jr., Esq."

On the 6th of April, 1820, William Tilghman Chew, the grandson, died. Mrs. Livingston and Mrs. Greenleaf inherited from him the reversion which he had inherited from his mother, of the lands and ground-rents in Northampton county, of which Chief Justice Tilghman was tenant by the curtesy. Between the passing of the above act of assembly in March, 1818, and the death of his grandchild, Chief Justice Tilghman, in pursuance of the authority contained in that act, made contracts of sale to divers persons to the amount of sixteen hundred and ninety-four dollars and ninety-six cents, on account of which it appears that seven hundred or eight hundred dollars were received by him in his lifetime.

Chief Justice Tilghman died on the 30th of April, 1827. By his

will, which was dated October 16th, 1819, after certain bequests, he charged his whole estate with the payment of debts and legacies, and in order to create a fund for the more convenient discharge of them, directed his executors to sell particular parts of his real estate in Pennsylvania, and gave the residue of his estate to his grandson, William Tilghman Chew. In the event of the death of this grandson, under age and without issue, he devised to the two sisters of his deceased wife as tenants in common, in fee, all his lots of ground, lands and tenements in the county of Lehigh, of which their father, James Allen, died seized; and in case any of them had been sold on ground-rent, he devised the ground-rents to them in the same manner; and directed all the rest of the real estate thereinbefore devised to his grandson, to be sold by his executors; proceeding as follows: " and the money arising from the said sales to be disposed of as follows. In the first place, my son-in-law, Benjamin Chew, Jr., if living at the time of the death of my grandson, as aforesaid, shall have for his own use five thousand dollars, in addition to the sum of ten thousand dollars, to which he is at all events entitled at my death in right of his late wife by virtue of a bond which I gave her in her lifetime." " In the next place," he gave thereout legacies to the amount of four hundred dollars; and directed the residue of the proceeds to be divided into five equal parts, of each of which he directed the distribution in certain proportions among the issue of his five deceased brothers and sisters respectively, with a provision for the widow of one of them. Four of these fifths were distributable among parties residing in Maryland, where a considerable portion of the testator's property was situate, and the other fifth among parties then in England. He appointed his son-in-law, Benjamin Chew, Jr., sole executor during the grandson's minority, with an annual allowance in lieu of compensation. On the full age of the grandson, or his death under age, he appointed E. S. Burd, Esq., executor jointly with Mr. Chew; directing that in the event of the death of his grandson under age, the executors should receive a commission of six per cent. on all moneys received from the proceeds of sale aforesaid and paid over by them as above directed.

This will was proved on the third day of May, 1827; on which day letters testamentary were granted to Mr. Burd and Mr. Chew.

On the 16th of May, 1827, Mr. Chew received the amount of the post obit bond mentioned above, and subscribed a receipt, referring to the conveyance of which the bond was the consideration, and stating "that the above payment of $10,000, by the executors of the said William Tilghman, is in full discharge of the said consideration money in the said indenture mentioned."

(Estate of William Tilghman, &c.)

On the 27th of May, 1827, Mr. Chew took out letters of administration of the goods, &c., of his deceased wife.

On the 2d of August, 1827, Mr. Chew subscribed an acknowledgment of the receipt of his legacy of $5000, deducting the state tax.

On the 21st of May, 1828, the executors settled a joint account in the register's office, which was shortly afterwards confirmed in the Orphans' Court.

In the month of April, 1830, a bill was filed on the equity side of the Circuit Court of the United States, by the residuary legatees, against the executors, praying an account and payment of their legacies. Separate answers were filed by the executors; Mr. Bird admitting a balance on hand for distribution among the legatees; Mr. Chew claiming a right to retain for a debt alleged to be due to him by the testator. The answer of Mr. Chew stated, that previously to his marriage with the daughter of the testator, " the terms and conditions on which the marriage should take place, were treated of, and an arrangement was made between the said testator, this defendant, and his father Benjamin Chew, Esq., whereby it was mutually promised and agreed, that the latter should give to this defendant on the said marriage, land in fee simple, valued at five thousand dollars, and allow him the interest of twenty-five thousand dollars annually: and the said William Tilghman would give for the advancement of his daughter in the said marriage, thirty thousand dollars. And he further declared and promised to this defendant and to his said father, that he the said William Tilghman, would do on the occasion of the said marriage, whatever the said Benjamin Chew the elder would do and more." The answer then referred to the paper of the 10th of July, 1816, and the memorandum of the testator dated on the 16th of August, 1816. The respondent admitted the payment to him or for his use by the testator, of the sum of twenty-five hundred dollars, and that he resided with the testator from the middle of October, 1816, until the death of his wife, and a short time afterwards. The respondent referred to the act of 1792, and averred that the testator notwithstanding his authority derived therefrom and his contract of July 10th, 1816, did not sell and convey the land during the minority of his daughter, nor his interest as tenant by the curtesy after her death, nor pay over to the defendant any part of the proceeds, or of the sum of thirty thousand dollars, except the twenty-five hundred dollars; nor did he pay the defendant any interest on the amount due; but on the defendant remonstrating with him on the non-fulfilment of his contract, he authorised him to receive the profits of a farm in Lehigh county, by the letter of 22d August, 1818, already given. The respondent stated that the profits of this farm did not net to him $100

(Estate of William Tilghman, Esq.)

per annum. The respondent then set forth divers sales of real estate of his late wife, by her father already stated, and the confirmation of these sales by him and his wife in consideration of the post obit bond of ten thousand dollars; and the answer then proceeded:

"But the respondent doth not, and never did consider the said bond an equivalent for the property released; but it became his property at the time of the execution thereof, and was so declared to be by the said William Tilghman to the respondent. The said bond remained in the respondent's possession, from the time of its execution until the said William Tilghman's death, and until the payment thereof by an appropriation of funds belonging to the estate. The eleventh schedule, hereto annexed, contains a copy of said bond, which was executed and delivered on the same day and at the same time with the deed of release aforesaid (although it bears on its face the date of the subsequent day). The respondent expressly alleges and maintains that a debt is now due to him from the estate of the said William Tilghman, by reason of the stipulations contained in the instrument hereinbefore referred to, dated the 10th day of July, 1816, and that he never received payment of the same, except to the extent of twenty-five hundred dollars as aforesaid. And the respondent denies that the said debt has ever been satisfied, either in the lifetime of the said William Tilghman, or by bequests and devises in his will. And the respondent expressly and especially denies that he ever received the said sum of ten thousand dollars in satisfaction, partly or wholly, of any debt due to him, except the debt due upon the said bond, or that he received the legacy of five thousand dollars, mentioned in the complainant's bill, in satisfaction or discharge of any debt or engagement, contract or liability whatever, or of any part or portion thereof, or that he received the profits of the farm above mentioned, in satisfaction of the interest on the sums due to him, except so far as the amount of the said profits would go towards the discharge of the same; but maintains that his right to recover the balance due upon the instrument of July 10th, 1816, and the interest that has accrued thereon, is unimpaired and in full force, to wit, the sum of twenty-seven thousand five hundred dollars, with interest thereon from the first day of August, 1817, deducting from the amount of the said interest the net profits received from the said farm from the 22d day of August, 1818, to the 29th day of April, 1827, when, by the death of the said William Tilghman, he was deprived of the said profits. And the respondent further states that he did not, at any time, or in any manner, relinquish or waive his right to receive from the said William Tilghman and from his estate, the sum stipulated in the instrument dated the 10th day of July, 1816, with interest thereon. On the contrary, he declared repeatedly to the said William Tilghman, and at sundry times, that he considered the same due to him, and the said William

Vol. v.—8

Tilghman liable for the same.    The said William Tilghman gave no direct or sufficient answer to such remarks, but on one of the occasions referred to, observed, that if *he* was to pay this defendant, he would have to sell the house over his head, which expression was among the most powerful reasons why this respondent deferred insisting on his legal rights during the lifetime of his said father-in-law. On two different occasions the defendant declared to the said William Tilghman as aforesaid (that he considered the said sum due, and the said William Tilghman liable for it), previously to the 10th day of May, 1818.    He did not prosecute or pursue his claims except by personal remonstrances during the lifetime of the said William Tilghman, because of a sincere attachment to him, and of a decent respect for his ease and comfort, and because of the respondent's firm conviction that his lawful rights, acquired and parchased by an ample, valuable consideration furnished by his father, as well as by the good consideration of his marriage, would be in no manner impaired by his postponing to take legal measures for their recovery.    The respondent states that at the foot of the instrument dated the 10th day of July, 1816, there appears a memorandum dated the 10th day of May, 1818, a copy of which is part (numbered B) of the fourth schedule hereunto annexed.    The respondent explicitly denies that he, at any time, directly or indirectly assented to the same memorandum, or to the principles therein expressed.    He positively asserts that he had no knowledge whatever thereof, or of any intention of the said William Tilghman to make such a memorandum, until long after it was made; and he distinctly and positively alleges and asserts, upon his oath, that it is in spirit and in letter, in form and in matter, wholly and directly contradictory and at variance with his views, expectation, belief and conviction, and with his unvaried, avowed, well known and positive declarations and determination.    The said instrument, dated the 10th day of July, 1816, having been prepared by the said William Tilghman, and presented by him to this defendant for assent, and having the signature of this respondent to it, and it being a matter of indifference in the hands of which of the two parties it should remain, when they had such faith in one another as to make and sign but one copy of an obligation, without witnesses, whereby they were bound to each other in the amount of so many thousands; and this respondent having a perfect confidence in the honour and good faith of his father-in-law, which are manifested by the preservation of the instrument, it naturally remained in the said William Tilghman's possession.    But the respondent always regarding it as remaining there as in a place of safe keeping merely, without any right in either party to add, alter, amend or impair its full force and effect, and without any right of either party to inscribe or to endorse thereon any thing expressing sentiments of either party derogatory to their mutual understanding at the time the contract

(Estate of William Tilghman, Esq.)

between them was made. And the respondent expressly protests against the said memorandum, and maintains that the original instrument itself remains in full force and virtue altogether unaffected by the memorandum made by one of the parties. The respondent further states, that besides the sales of the said William Tilghman, already enumerated, he and his wife did, on the 3rd day of April, 1798, convey to a certain Samuel Davis, for a nominal consideration, a tract of land being the estate of his said wife, the mother of the wife of the respondent, in the county of Northampton, containing five hundred acres adjacent to the borough of Northampton, which was reconveyed by the said Samuel Davis, on the same day, for a like nominal consideration, to William Tilghman alone, who afterwards sold the same in various parcels to various persons for large sums of money, which were invested by him, as the respondent has frequently heard and does verily believe, in the purchase of the house and lot in Chestnut street, where he resided for many years, and which he afterwards sold for forty-two thousand five hundred dollars. And the said William Tilghman, during the minority of his said daughter, sold, under the power vested in him by the act of assembly dated the 11th day of April, 1799, sundry lots of ground belonging to his daughter, reserving a ground-rent of one or two dollars on each lot sold, payable to himself for life, and after his death to his said daughter and her heirs. And he also received from the purchasers, for his own use, large sums of money or value, in addition to the said ground-rents, amounting at least to six thousand eight hundred dollars. And the said William Tilghman did request and desire this respondent, after the decease of his said wife, to unite with him in a petition to the legislature of Pennsylvania, for authority to sell during the minority of the respondent's said son, lots in the borough of Northampton belonging to the said son of the respondent; and the respondent did accordingly join in such petition. An act of assembly was passed on the 23d of March, 1818, (Laws of 1817—1818), giving the said authority; and sales were made in virtue thereof, by the said William Tilghman, who received the purchase-money or value, amounting to more than seven hundred dollars. The said William Tilghman thus received from the various sources aforesaid, property and estates belonging to the wife and son of this respondent, or which would otherwise have belonged to them, a sum of money exceeding fifty thousand dollars, which in equity and good conscience ought to have been applied to the discharge of the marriage contract aforesaid. The respondent, therefore, denying any injury or wrong to the complainants, denies also that there is any hardship to them in his taking and appropriating from the estate of the said William Tilghman the money which is due to him upon the said marriage contract, and the interest thereon accrued, inasmuch as the said William Tilghman added to his own estate a sum much larger than is sufficient

(Estate of William Tilghman, Esq.)

to pay the amount stipulated for by the said contract, together with the interest thereon, by means which were derived from the estates which would otherwise have come into the possession of the wife and son of this respondent and of himself."

After argument the judges of the Circuit Court decided against the claim of Mr. Chew to retain the balance.*

The executors settled a second account in the Orphans' Court, on the 11th of August, 1830.

After the decision of the Circuit Court, Mr. Chew applied to the Orphans' Court to be discharged from the executorship; and under this application, having settled an account, he was discharged by the Court in 1832.

In 1835 the several accounts of the executors were referred to an auditor, by whose report it appeared, that there was a balance in the hands of Mr. Burd, the executor, of thirty-eight thousand seven hundred and eighty-seven dollars and eighty-four cents, to be distributed among the residuary legatees, &c.

On the subject of the claim of Mr. Chew, the auditor reported as follows:

" On the part of Benjamin Chew, Jr., Esq., the son-in-law of the testator and legatee named in his will, it was alleged that the testator was indebted to him in the sum of twenty-seven thousand five hundred dollars, with interest from the 1st day of August, 1817. The claim was founded upon certain documents purporting to be proposals made a short time previous to the marriage of the testator's daughter with Mr. Chew, for the settlement of her property. In the Circuit Court of the United States, for the Eastern District of Pennsylvania, a bill having been filed by certain of the present legatees against the executors for an account and distribution, Mr. Chew set up his claim for payment of this alleged debt out of the assets; upon which evidence was taken, which by consent was laid before me. The facts and law of the case were fully investigated and considered in that Court, and the opinion of that Court was adverse to the claimant. I have not been able to discover in the documentary evidence or depositions laid before me, any thing to induce me to come to a contrary conclusion." " I report therefore against this claim." After noticing the claim of one other creditor, " No other claims as creditors than the foregoing were laid before me."

Exceptions were filed by Mr. Chew to this report; but after argument, the exceptions were overruled, and the report confirmed.

An appeal was then taken by Mr. Chew, who claimed in this Court to stand as a creditor of the estate of Mr. Tilghman;

* See 1 *Baldwin's Rep.* 464, (*Tilghman* v. *Tilghman's Executors.*)

(Estate of William Tilghman, Esq.)

1st. In his own right, to the sum of twenty-seven thousand five hundred dollars, with interest, under the writing of the 10th of July, 1816.

2nd. As administrator of his deceased wife, to the sum of seven thousand five hundred dollars, being the alleged proceeds of real estate sold by virtue of the act of 3d April, 1790.

The case was first argued at December Term, 1838.

Mr. *S. Chew* and Mr. *J. R. Ingersoll*, for the appellant, contended,

1st. That the Orphans' Court had jurisdiction of the claim. They referred to the acts of 29th March 1832, § 16, 21, 55, 56, 57; and 24th of February, 134, § 19; 14th April, 1835, and 6th March, 1812; and cited *Bowman* v. *Herr*, (1 *Penn. Rep.* 282.) *Porter's Estate*, (7 *Serg. & Rawle*, 17.) *Walker's Estate*, (3 *Rawle*, 243.) *Smith's Estate*, (1 *Ashmead*, 352.)

2nd. That the letter of the 10th of July, 1816, was a contract by Mr. Tilghman, for a sufficient consideration, to pay the appellant the sum of thirty thousand dollars, unimpaired by reference to a particular fund. *Graves* v. *White*, (2 *Freeman*, 57.) *Hollis's Case*, (*Ib.* 3.) *Harvey* v. *Chamberline*, (*Ib.* 200.) 1 *Powell on Contracts*, 288. *Moore* v. *Heart*, (2 *Rep. in Chancery*, 147.) *Bird* v. *Blossie*, (2 *Ventris*, 361.) *Austin* v. *Meddlicot*, (9 *Ves.* 21.) *Wackford* v. *Featherly*, (2 *Vernon*, 322.) *Luders* v. *Ausly*, (4 *Ves.* 507. 512. 514.) *Barstow* v. *Kelvington*, (5 *Ves.* 599.) *Table et al.* v. *Archer*, (3 *Hen. & Munford*, 349; S. C. 409–423.) 14 *Viner*, 281. 542. *Corbert* v. *Maidwill*, (1 *Salk.* 159.) 6 *Vin.* 464, pl. 40. *Hollis's Case*, (2 *Mod.* 91.) 1 *Viner*, 292, p. 6. *Id.* 277, pl. 7, 8, 9. *Id.* 287, pl. 3. *Id.* 289, pl. 16, 17. *Id.* 302, pl. 3. *Id.* 322, pl. 92. *Id.* 369, pl. 19, 20. *Id.* 379, pl. 2, 3, 4. *Tracey* v. *Poole*, (*Styles Rep.* 143.) *Bedwell* v. *Fenwick*, (*Id.* 393.) *Greenleng* v. *Bawdit*, (*Id.* 404.) 6 *Viner*, 442. *Badger* v. *Floid*, (12 *Mod.* 399.) *Chichester's Ex'r* v. *Vass's Adm'r.* (1 *Munford*, 98.) *King* v. *Withers*, (*Cas. Temp. Talbot*, 117. 123.) *Colston* v. *Alston*, (2 *Vern.* 453.) 16 *Viner*, 449, pl. 9, 11, 12. *Graves* v. *White*, (2 *Freeman*, 57, 58.) *Row* v. *Tillier*, (2 *Chancery Cases*, 94.) *Penn* v. *Preston*, (2 *Rawle*, 14.) *Hulings* v. *Craig*, (*Addison*, 342.) *Barr* v. *Hill*, (*Id.* 276.) *Perkins* v. *Gray*, (3 *Serg. & Rawle*, 331.) *Gilpin* v. *Consequa*, (3 *Wash. C. C. Rep.* 184.) *Blight* v. *Ashley*, (1 *Peters's Rep.* 85-91. 25.) *Youqua* v. *Nixon*, (*Id.* 221.) That the designation of the fund did not vary the contract. *Roberts* v. *Peacock*, (4 *Ves.* 154. 157-160.) *Chaworth* v. *Birch*, (*Id.* 561.) *Saville* v. *Blacket*, (1 *P. Wms.* 778.) *Coleman* v. *Coleman*, (2 *Ves. Jr.* 639.) 3 *Dess.* 358. 377. 379. 384.) *Scott* v. *Blair*, (MS.)

3d. That the appellant was entitled to the proceeds of sales, *jure representationis;* and that nothing had intervened to defeat or impair his rights. 1 *Call's Rep.* 88. *Wallace* v. *Duffield*, (2 *Serg. & Rawle*, 527.) *Micnay* v. *Blatchford*, (1 *Wendell*, 518.) *Johnson* v. *Hum-*

(Estate of William Tilghman, Esq.)

phreys, (14 *Serg. & Rawle,* 394.) *Brashiers* v. *Gratz,* (6 *Wheaton,* 528.) *Hepburn* v. *Auld,* (5 *Cranch,* 263.) *Seton* v. *Slade,* (7 *Ves.* 265.) 1 *Viner,* 379, *pl.* 3. *App* v. *Dresback,* (2 *Rawle,* 303.) *Methodist Church* v. *Remington,* (1 *Watts,* 221.) *Patterson* v. *Nichol,* (6 *Watts,* 379.) *Jones* v. *Moore,* (5 *Binney,* 573.) *Angell on Lim.* 351. 278. 354. 185. 181. 3 *Hen. & Mun.* 413, 414. *Randall* v. *Willis,* (5 *Ves.* 270.) *Summerville* v. *Holliday,* (1 *Watts,* 514.) *Ex parte Dewday,* (15 *Ves.* 487.) *Waln* v. *Sherman,* (8 *Serg. & Rawle,* 362.) *Decamp* v. *Feay,* (5 *Serg. & Rawle,* 323.) *Thompson* v. *M'Gaw,* (2 *Watts,* 161.) *M'Mullin* v. *Day,* (1 *Miles,* 136.) *Adlum* v. *Yard,* (1 *Rawle,* 163.) *Gray* v. *Bell,* (4 *Watts,* 410.) 2 *Ves.* 696. 2 *Sch. & Lefoy,* 450. *Earl of Northumberland* v. *Earl of Ayleford,* (*Ambler,* 540. 567.) *Webb* v. *Earl of Shaftsbury,* (7 *Ves.* 488.) *Herne* v. *Herne,* (2 *Vern.* 555.) 5 *Ves.* 857. *West's Rep.* 480. 488. *Rutter* v. *McLean,* (4 *Ves.* 531.) 6 *Dow,* 179. 2 *Wheaton,* 37. *Clark* v. *Guise,* (2 *Ves. Sen.* 617.) *Byrne* v. *Byrne,* (3 *Serg. & Rawle,* 55.) *Toller on Executors,* 133. *Buller's N. P.* 175. *Meddlicot* v. *Boerses,* (1 *Ves. Sen.* 207.) *Waln* v. *Anthony,* (5 *Serg. & Rawle,* 468.) *Cauffman* v. *Cauffman,* (17 *Serg. & Rawle,* 23.) *City* v. *Davis,* (1 *Wharton,* 502.) *Webb* v. *Earl of Shaftsbury,* (7 *Ves.* 488.) 11 *Viner,* 72. *Smith* v. *Black,* (9 *Serg. & Rawle,* 144.) *Baldw.* 486.

Mr. *Cadwalader* and Mr. *Rawle,* for the residuary legatees, cited *Willes's Rep.* 156, 7. 1 *Saunders,* 320, n. 4. 2 *Saunders,* 108, n. 3. *M'Evellish* v. *Churchman,* (4 *Rawle,* 35.) *Feversham* v. *Watson,* (*Prec. in Chancery,* 445 ; S. C. 2 *Freeman,* 35.) 2 *Powell on Contracts,* 19, 20. *Baker* v. *Biddle,* (1 *Baldwin,* 418, 419.) *Commonwealth* v. *Ferree,* (8 *Serg. & Rawle,* 314.) *Leib* v. *Bean,* (*Ashmead's Reports,* 208, 209.) *Scott* v. *Sermon,* (*Willes's Rep.* 404.) *Taylor* v. *Plumer,* (3 *Maule & Selw.* 562.) *Lancaster* v. *Dolan,* (1 *Rawle,* 308.) *Ingersoll* v. *Sergeant,* (1 *Whart. Rep.* 337.) *City of Philadelphia* v. *Davis,* (1 *Whart. Rep.* 490.) *Hunt* v. *Rousmaniere,* (8 *Wheaton,* 174.) *Mason* v. *Libinguth,* (2 *Rawle,* 430.) *Hunt* v. *Rousmaniere,* (1 *Peters's S. C. Rep.* 1.) *Bank U. S.* v. *Daniel,* (12 *Peters,* 55, 56.) *Bilbie* v. *Lumley,* (2 *East,* 472.) 1 *Rolle's Abr.* 374. ch. n. *Langstaffe* v. *Fenwick,* (10 *Ves.* 406.) 2 *Roper on Leg.* 378 ; *Northumberland* v. *Egremont,* (*Ambler,* 540.) *Adlum* v. *Yard,* (1 *Rawle,* 171.) *Gray* v. *Bell,* (4 *Watts,* 413.) *Graves* v. *Forman,* (3 *Ves.* 67.) *Wilson* v. *Townsend,* (2 *Ves. Jr.* 697.) *Boyle* v. *Boyle,* (1 *West,* 662.) *M'Namara* v. *Jones,* (1 *Bro. Ch.* 481.) *Webb* v. *Shaftsbury,* (7 *Ves.* 481.) *Herne* v. *Herne,* (2 *Vern.* 555.) *Jenkins* v. *Jenkins,* (2 *Ves.* 617.) *Blake* v. *Bunbury,* (4 *Br. Ch.* 21.) *Rutter* v. *M'Lean,* (4 *Ves.* 531.) *Rancliffe* v. *Parkins,* (6 *Dow,* 179.) *Broome* v. *Mauch,* (10 *Ves.* 609.) *Ten Brook* v. *Livingston,* (1 *John. Ch. Rep.* 362.) *Cook* v. *Martin,* (2 *Atkyns,* 3.) *Drewry* v. *Thacker,* (3 *Swanst.* 548.) *Fitzherbert,* 188, tit. Bar. 12 *H.* 4, pl. 21. *Plowden,* 185, 6. *Hobart,* 10 pl. 20. *Sir W. Jones,* 345. *Hutton,* 128. *Skinner,*

214. *Salkeld's Reports*, 304. *Hicks* v. *Gore*, (3 *Peere Williams*, 184.) *Cheetham* v. *Ward*, (1 *Bosan.. & Pul.* 633.) *Bosanquet* v. *Wray*, (6 *Taunt.* 597.) *Thomas* v. *Thompson*, (2 *Johns. Rep.* 471.) *Eichelberger* v. *Morris*, (6 *Watk.* 43.) 11 *Viner*, 72, pl. 2. *Loomes* v. *Stothart*, (1 *Sim. & Stuart*, 458.) *Ex parte Mason*, (5 *Binn.* 168.) *Griffith* v. *Chew*, (8 *Serg. & Rawle*, 17.) *Siter's Estate*, (4 *Rawle*, 483.) *Whitaker* v. *Whitaker*, (6 *Johns.* 117.) *Burdet* v. *Hicks*, (2 *Brownlow*, 50.) *Thomas* v. *Thomas*, (2 *Johns.* 481.) *Hampton's Case*, (17 *Serg. & Rawle*, 146.) *Thomas* v. *Reigel*, (5 *Rawle*, 281.) *Brisban* v. *Davis*, (5 *Taunt.* 144.) *Moore* v. *Butler*, (2 *Sch. & Lef.* 266.) *Lewis* v. *King*, (2 *Br. Ch.* 600.) *Thellusson* v. *Woodford*, (13 *Ves.* 220.) *Leonard* v. *Crammelin*, (1 *Edwards's Ch. Rep.* 206.) *Stump* v. *Findlay*, (2 *Rawle*, 173.) *Allen* v. *Getz*, (2 *Penn. Rep.* 322.) *Cauffman* v. *Cauffman*, (17 *Serg. & Rawle*, 16.) *Heron* v. *Hoffner*, (3 *Rawle*, 396.) *Blake* v. *Bunbury*, (1 *Ves. Jr.* 514.) *Macnamara* v. *Jones*, (1 *Br. Ch.* 481.) *Pusey* v. *Desbouvier*, (3 *P. Wms.* 315.) *Wake* v. *Wake*, (1 *Ves. Jr.*, 335.) *Rogers* v. *Rogers*, (3 *Wend.* 503.) *Johnson* v. *Humphreys*, (14 *Serg. & Rawle*, 394.) *Wentz* v. *Dehaven*, (1 *Serg. & Rawle*, 312.)

The Court having directed a re-argument upon the question of the character and right to the proceeds of the sale of the real estate sold under the authority of the act of 1790, the case was again spoken to at March Term, 1839, by

Mr. *S. Chew* and Mr. *J. R. Ingersoll*, for Mr. B. Chew; Mr. *Cadwalader* and Mr. *Rawle*, for the residuary legatees; and Mr. *E. S. Coxe* and Mr. *Ingraham*, for the heirs-at-law of Mrs. Tilghman.

The opinion of the Court was delivered by

SERGEANT, J.—The first question which has been argued in this case is, the proper construction and effect to be given to the contract of July 10th, 1816, upon which the claim of the appellant to render the estate of William Tilghman liable, altogether depends. This point has been so carefully examined by the judges of the Circuit Court of the United States for this district, in the case of *Tilghman and Wife* v. *Tilghman's Executors*, reported 1 *Baldw.* 464, that it is unnecessary to do more than refer to the reasons there given, as we concur entirely in the opinions delivered by the judges, that this contract was not an obligation on the part of of William Tilghman to pay the portion of thirty thousand dollars, out of his own estate, at all events, but an arrangement to raise it out of his daughter's real estate, of which he was tenant by the curtesy, by a sale to be made after she should arrive at the age of twenty-one; and as this arrangement failed to take effect in consequence of her decease shortly after that period, without any act or default of William Tilghman, but by events that were unavoidable, the provision was, so far as it was not in part executed, defeated.

(Estate of William Tilghman, Esq.)

The next question arises on the claim of Benjamin Chew, Jr., as administrator of his late wife, to the sum of 7500 dollars, which money, he alleges, was received by Wm. Tilghman in his lifetime, from sales of real estate in Northampton county that had belonged to William Tilghman's late wife, and of which he was tenant by the curtesy. These sales were made under the power vested in Wm. Tilghman by an act of assembly passed the 3d of April, 1790. By the 5th section of this act, after reciting that the said William Tilghman is seised for life, as tenant by the curtesy, with remainder in fee simple to his said child, of part of the town of Northampton, and of lands adjoining the said town, and that it will be a benefit both to the public and to the said William Tilghman and his said child, that the lots already laid out in the said town, or which may be laid out on lands adjoining thereto, should be conveyed to such persons as may be willing to purchase the same in fee simple, reserving an annual ground-rent charged thereon as has been usual, it then enacts, that "the said Wm. Tilghman shall be and is hereby authorised, during the minority of his said child, to sell and convey in fee simple, to such persons as he shall think proper, any lots lying within the aforesaid part of the said town of Northampton, or to be laid out in lands of which he is seised as aforesaid, adjoining the said town; provided, that there be reserved a perpetual ground-rent of at least two dollars, issuing out of and charged on each lot, to be paid to the said William Tilghman for his life, with remainder in fee simple to the heirs of his said late wife." Under this power, William Tilghman made sale, from time to time, of lots and lands coming within the description mentioned in the act, on which he respectively reserved ground-rents of two dollars per annum in the manner prescribed; but also received in hand, or contracted to receive gross sums on many of the sales, in addition to the ground-rent stipulated to be paid. The exact amount of the whole money thus received was a matter disputed in this cause: the appellant alleging it to have been 7500 dollars, and claiming the same with interest; the appellees stating it at 5000 dollars or less.

The question is, how this money in the hands of William Tilghman at the time of his death, is to be considered, whether as personal or real estate. If the former, it passed to B. Chew, Jr., in right of his late wife, who died before her father, William Tilghman; but, if it is real estate, then it is claimed by the heirs of Wm. Tilghman's former wife, her daughter and grandchild having both died before Wm. Tilghman, and his estate by the curtesy having prevented the claim of B. Chew, Jr., as tenant by the curtesy.

If sales by William Tilghman in the mode above-mentioned, were good, (and we must now take them to be so,) they could only be valid because they were made under the power conferred by the act of assembly. Without such an act, Wm. Tilghman could have conveyed no more than his life-estate; and at his decease, as events

have transpired, the lots and lands would have descended to the heirs of Mrs. Tilghman. No private act of assembly could have been procured to authorise a tenant by the curtesy to sell lands, without investing the proceeds of the sales in the same manner as the title to the land was held ; and that object the act in question attained, by directing that ground-rents should be reserved out of the lands when sold, and that those ground-rents should be payable to the tenant by the curtesy during his life, and after his decease, to the heirs of his deceased wife,—thus substituting a ground-rent issuing out of the land for the income or profits of the land. Thus far all is clear enough. But what is to be done with the surplus money, beyond the amount of the ground-rents? As to this there is no legislation ; the act is silent. It appears to me, that we have no other rule to go by than that by which all other conveyances are construed ; and that such an act of assembly is to be construed like other conveyances, by the established principles of law and equity in relation to them ; for a private act of assembly for such purpose is but a mode of assurance. Private acts of parliament, says Blackstone, are, especially of late years, become a very common mode of assurance. They are looked on rather as a private conveyance, than as the solemn act of the legislature. A general saving is constantly added, at the close of the bill, of the right and interest of all persons whatsoever, except those whose consent is given or purchased, and who are therein particularly named, though it hath been holden, that even if such saving be omitted, the act shall bind none but the parties. 2 Bl. Com. 344, 345, 346.

Then the case is, that in a conveyance a power is given to sell real estate, and raise a sum of money by passing the fee, but the conveyance is silent as to the nature or disposition of a part of that money. Is that money personalty, or does it still partake of the nature of real estate? In the conversion of real estate into personalty by will, the rule is well settled, that if executors be empowered by will to sell real estate for certain purposes, such for instance, for the payment of debts, or raising portions, and the sale is made, but a surplus remains undisposed of ; whether that is occasioned by the silence of the testator, or by lapse, or other cause of inefficiency in the will, the heir at law takes the residue as he would have taken the real estate. *Leigh & Dalz. on Conversion,* 92, and cases. So here, if the act of assembly empowers the tenant for life to sell a fee simple, reserving a ground-rent for part of the consideration and receiving a gross sum for the surplus ; and from silence on the part of the legislature who create the power, no disposition is made of such sum ; it continues real estate under the same limitations and restrictions as it before possessed, until it is subsequently impressed with the character of personalty by the owner ; and that owner must be either one holding the absolute title in fee, or all the persons holding the different estates composing the fee. There is

nothing to show any act or intention in the owners to convert this into personalty; and indeed the daughter's power to do so was liable to objection, she being a minor and afterwards a feme covert.

Mere possession of the fund in money by William Tilghman, as trustee for those entitled after his death, did not change its character; it was still real estate. If money which has been impressed with the character of realty, is in the hands of a trustee, not placed out by him, but remaining in covenant, the wife dying in the lifetime of the trustee, the heir takes it, and not the administrator of the wife. 1 *P. Wms.* 172.

This disposition of the fund seems to me in the present case reasonable and just, and such as the legislature, if its intention had been expressed in the case, would have enacted. For then the gross sum, which is part of the price of the land, goes exactly as the ground-rents go, which constitute the other part of the price; that is, in lieu of the land and as a substitute for it. And if the power to stipulate for this gross sum exists, it is because it was more convenient to sell in that way than for a higher ground-rent. This is a circumstance which ought not to change the nature and character of the price, or make one portion of it real, and the other portion personal,—one to pass in one line of descent and the other in another and different line of descent.

We think the Orphans' Court had jurisdiction over this fund, being the proceeds of sale of the real estate paid into Court, under the 19th section of the act of 24th February, 1834.

Decree accordingly.

---

The following decree was entered in this case:—

The decree of the Court below is confirmed so far as respects the claim of Benjamin Chew, Jr., to be a creditor of the said estate for the sum of $27,500, with interest, or any part thereof.

And also, so far as respects the claim of said Benjamin Chew, Jr. as to the sum of $7,500 or any part thereof, being the proceeds of certain real estate claimed as belonging to the daughter of William Tilghman, Esq., (subject to his curtesy,) sold by the said William Tilghman, Esq., during his lifetime.

The Court is of opinion, that the proceeds of said real estate so sold remained impressed with the character of real estate, and as such, passed on the decease of said William Tilghman, to the heirs at law of Margaret Elizabeth Tilghman, his late wife; and a claim on their behalf to said proceeds having been presented to this Court on this appeal, the record is hereby remitted to the said Orphans' Court, that the same may be examined and settled according to law.