## F. M. PAUL & others *vs.* EMMA YORK.

### April Term, 1874.

DOWER—IMPROVEMENTS BY DOWRESS BEFORE ASSIGNMENT.—A widow who, before assignment of dower, makes improvements on land assigned to her in dower, cannot claim compensation for the improvements thus made.

INFANTS LANDS—IMPROVEMENTS BY MOTHER.—A mother who, without authority, makes valuable improvements on the land of her infant children, with full knowledge of their title, is not entitled to compensation therefor.

CONVERSION OF INFANT'S PERSONALTY INTO REALTY—DEATH OF INFANT.— The personal estate of an infant, converted into realty, upon bill filed for the purpose, by decree which omits the direction that the realty shall be held in the same manner and subject to the same rules of descent and distribution as the

personalty, will nevertheless, upon the death of the infant under age, descend as personalty, and the fact that the conversion was made at the instance of the mother, as the next friend of the infant, will not prejudice her right to have it so distributed.

*J . W Ewing*, for children.

*J. L. Rice*, for mother.

THE CHANCELLOR :—John York departed this life in July, 1868, intestate, leaving a widow, Emma York, and three children, John, Joseph and Emma, all infants. His estate consisted of a lot in Edgefield, on which was his dwelling, and a store, and sixteen or seventeen thousand dollars of personality. The widow qualified as administratrix of his estate, and while acting as such, under an order of the court made at its April term, 1869, upon proceedings had in the name of the children by her, as their next friend, she invested $5,250 of the funds in her hands going to her children, in a lot of land adjoining the realty of the estate, and had· the title made to her children. She also made improvements upon both the lot descended, and the lot bought, and expended other sums in necessary repairs. In August, 1869, Emma, the daughter of John York, died, and in September, 1869, Joseph, one of the sons, also died. On the 13th of October, 1870, Emma York, the widow, filed her bill in this court against her son John York, setting out the foregoing facts, stating that the property purchased had been purchased "for and in the name of her children," that " the lot of which her husband died seized belongs, of course, to her child, saving her dower interest in the same, which she is desirous of relinquishing to her said child," and asking that the property be sold, upon the ground that such sale was manifestly to the interest of said child, and that she had removed with her child to the state of Ohio, and that it was to his interest to sell and re-invest in that state. The relinquishment of dower thus suggested in the bill, turned out, in the progress of the cause upon taking her deposition, to be a proposition to sell her dower for what it is worth, " according to the rules of law in ascertaining such valuation." This cause

seems to have proceeded to a reference and report, and there stopped. It is clear that this bill, not being in conformity with the provisions of our statute law in relation to the sale of the real estate of infants, should be dismissed with costs.

On the 23d of January, 1871, F. M. Paul, and others, the sureties of Emma York on her administration bond, filed their bill in this court against her and her son John York and others, for a settlement of the administration, and such proceedings were had that an account was taken which was satisfactory to the parties. But the reference made in the cause, and the report of the clerk and master undertook to go beyond the scope of the bill, and to take an account of the expenditures of the widow in the repairs and the improvements of the land descended and bought as aforesaid. Under this report, and by exceptions thereto, the parties sought to raise the questions between the widow and her only surviving child touching said land and expenditures made thereon, and rents collected therefrom. The widow, also, by way of exception to the report, set up a claim to a share of the realty bought by her for her children as aforesaid, upon the ground that the land, thus bought with the money of infants, would be treated in equity as personalty, and that she would take a share thereof as distributee upon the death of two of her children. These matters were passed upon by the presiding judge, but, upon appeal to the supreme court, it was held that the pleadings did not justify the decision of these questions. The decree was, therefore, affirmed as to the administration account, and the cause remanded " with leave to either party to so amend the pleadings, or adopt such other pleadings as he or she may choose," in order to raise these questions.

On the 25th of February, 1874, Emma York files what she calls a cross-bill in the case of *Paul & others* v. *York & others*, but which is in reality an original bill against her son John York, in which she asks for dower to be allowed to her in the realty of which her husband died seized and possessed, and for an account of the rents of such property. She also

sets out the facts touching the purchase of the realty in 1869, that she made the purchase believing it to be to the interest of the children, but without any intention to deprive herself of any right she might have in the funds thus invested in the events which happened, namely the death of her two children. That she is a foreigner with only a limited knowledge of the language, and less knowledge of the laws of the country. (Of these last allegations, if entitled to any weight, there is no proof.) The bill also sets out the repairs and improvements put upon all the realty, and prayed that she be allowed for moneys thus expended, and that she be decreed to have a share in said realty as distributee of her deceased children. The infant defendant has answered by guardian *ad litem*, and the cause has been brought on for hearing without any proof except what is contained in the record in the case *Paul & others* v. *York & others*. It seems to be understood that the evidence introduced in that case shall be considered as evidence in this case.

It is clear that the complainant is entitled to dower in the lands descended from her deceased husband, and to one-third of the rents received. If the improvements put upon the land since the death of the husband, had been made by the heir, or by an innocent third person, some delicate, and perhaps difficult questions might arise as to how the allotment of dower should be made in view of the change occasioned by these improvements. But, inasmuch as the improvements were made by the complainant herself voluntarily, there need be no difficulty on this score. She may, at her election, have the allotment made as the property stood at the death of her husband, or as it now stands. In either event, she will take the land assigned to her with the improvements thereon, and will not be entitled to claim credit or compensation for any improvements or repairs made thereon by her. For, if the assignment of dower had been made immediately upon the death of her husband, such improvements or repairs would have been at her own charge. *Cannon* v. *Hare, ante* 22. She will be entitled to an ac-

count of the rents of the land descended, and to one-third of the net rents after deducting taxes, insurance, ordinary and necessary repairs, and costs of collection. Whether she shall have any credit for new and substantial improvements which have enhanced the value of that part of the property not covered by the dower, will be considered presently.

We will first, however, consider the grave and difficult question whether the complainant is entitled to any part of the land bought after the death of the husband. This land, it will be remembered, was bought by her, under order of this court, and the title taken to her three children then living. Two of these children died within a few months thereafter. If the fund thus invested in land had remained personalty, or if the land in which the fund had been invested, had been ordered by the court to be held, to use the language of § 3,338 of the Code, " in the same manner and subject to the same rules of descent and distributions as the property which was sold," it is clear that the complainant, as distributee of her children, would have taken an equal share with the surviving children, and surviving child under the Code § 2,429 subs. 5. The doubt grows out of the fact that the title was taken, under order of the court, to the children without any condition, reservation, or declaration of right. In this state of facts, it is urged that the complainant is estopped to deny her own act, recognized by her bill of the 13th of October, 1870, and by the legal effect of the conversion of the personalty into realty out and out, by judicial order, without reservation.

Upon the first of these grounds, I am inclined to think the complainant is not barred from claiming any rights, if she have them. The conversion, it is true, was made at her instance, and the title taken to the children by herself; but she was induced to make the investment by the belief, in which she is sustained by the court, that it was for the interest of her children. It will be hard enough upon her to deprive her of all share in her children's interest in this land, by the legal result occasioned by the difference in the

law of descent and the law of distributions, if such is the inevitable consequence of what has been done, without barring her because she was active in procuring the change for the benefit of her children.

The other objection is far more weighty, and the question raised has never been directly settled so far as the research of the learned counsel, and of myself, enables me to speak. All that we can do, therefore, is to examine the authorities, and see whether we can, from them, in the light of our own statutes and decisions, come to a satisfactory conclusion.

The earliest case upon the subject of investments of the personalty of infants in realty, where the subject seems to have been much considered, is *Earl of Winchelsea* v. *Norcliff*, 1 Vern. 435, which was · heard in 1686 by the Lord Chancellor, Jeffries, the Master of the Rolls, Chief Baron Atkins, and Mr. Justice Lutwich. There, the trustees of an infant had invested £3,000 profits of realty in lands commodious to the infants estate, with the consent of the guardian, who was also the grandmother of the infant. The infant died, and the trustees were held liable to the personal representative of the infant for the money thus invested, and interest to the extent of the rents of the realty. The Lord Chancellor said : " He did agree, if the trustee had come to this court and obtained a decree for the investing this money in a purchase [of land], this court would have maintained its own decree ; but not having done so, but voluntarily put an election in an infant, who never made any, he thought they remained accountable for the money as being part of the infant's personal estate." This decision, as will be seen presently, has been followed in *Roberts* v. *Jackson*, 3 Yer. 77.

It will be noticed, that the Lord Chancellor says that if the trustee had obtained a decree authorizing the purchase, the court " would have maintained its own decree." This language is repeated in *Inwood* v. *Twyne*, Amb. 417 ; S. C. 2 Eden 154, which was the case of the purchasing in of a jointure estate upon petition, concurred in by the infant's mother, who was the jointress. Lord Northington held that

the conversion was complete, and decided against the mother claiming as administratrix of the son. This case is repeatedly referred to in the argument of the famous case of John Bromfield, a lunatic, reported so often by Brown and Vesey, as cited below, and is the only case which hints at a conversion out and out under such circumstances.

*Awdley* v. *Awdley*, 2 Vern. 192 was heard in 1690 before the Lord Commissioners, Rawlison and Hutchinson. This was a case where the committee of a lunatic had invested a part of their ward's personalty in land. The court, "after great debate," decreed, upon the death of the lunatic, an account of the personal estate, "and the lands purchased to be sold, and the money to go and be divided in personal estate amongst the next of kin." This case is the more remarkable, as it has been since generally held that in cases of lunacy there is no equity between the real and personal representatives, "but the interest must be taken as fortune has directed." Lord Loughborough, in *Lord Compton* v. *Oxenden*, 2 Ves. 265. See S. C. 2 Ves. 69 ; 3 Bro. C. C. 510 ; 4 Bro. C. C. 397, and under the style of *Ex parte* Bromfield 4 Ves. 453. Lord Eldon uses substantially the same language in *Ex parte* Phillips, 19 Ves. 123, drawing a distinction in this regard between the estate of a lunatic and the estate of an infant. But the same language is used in some of the authorities touching infant's estates, "that there is no equity between different classes of heirs." *Langley* v. *Sneyd*, 1 Sim. & St. 55 ; Sto. Eq. Jur. § 1,357, citing, however, no authority upon this specific point.

This doctrine, which is usually traced back to the broad language of Lord Rosslyn in *Walker* v. *Denne*, 2 Ves. Jr. 175, 176, has been repeatedly overruled by subsequent decisions. *Wheldale* v. *Partridge*, 8 Ves. 227 ; *Biddulph* v. *Biddulph*, 12 Ves. 161 ; *Kirkman* v. *Miles*, 13 Ves. 338 ; *Ashby* v. *Palmer*, 1 Mer. 296.

*Witter* v. *Witter*, 3 P. Wms. 99, before Ld. Ch. King in 1730, was the change of a lease for years into a lease for lives by an executor. The Lord Chancellor said : " This re-

newed lease, though for lives, shall follow the nature of the
original one, and go to the executor or administrator of the
infant as that would have done. If the fact had been that
the lessors would not have made any other than a descend-
ible lease for three lives, this might and ought to have been
declared in trust for the benefit of the executor or adminis-
trator of the infant, if he should die during his infancy.
Now, though this trust be not declared, yet it is in equity
implied, since the renewed lease, though for lives, comes in
the place and stead of the original lease which was for years.''

But in *Pierson* v. *Shore*, 1 Atk. 480 in 1739, where a lease
for lives was renewed by trustees, upon the dropping in of
one life, by a new lease for lives, it was held, in a contest
between the heirs *ex parte materna*, who would have inher-
ited the first lease, and the heirs *ex parte paterna* who were
entitled to the renewed lease, that the change was author-
ized by the trust, and that the heirs *ex parte paterna* took.

In *Tullet* v. *Tullet*, Amb. 370, 1 Dick. 322, an infant was
seized of land in fee, and his mother, who was his guardian,
cut down the timber as upon the part of the infant; the heir
of the infant brought his bill to have the money which arose
from the sale of the timber severed; and the court held that
no benefit whatever should result to a person who, when she
did the act, might become next of kin of the infant; but
that the money should be reserved for the benefit of the
party entitled to the inheritance.

In *Ashburton* v. *Ashburton*, 6 Ves. 6, Lord Eldon, in 1801,
ordered money held in trust for an infant to be laid out in
the purchase of land, but, at the suggestion of an *amicus
curiae*, directed the land to be conveyed to a trustee in trust
for the person interested, his executors and administrators
until he should attain the age of 21, and afterwards for him
and his heirs. This is the starting point of the modern
usage, which is thus laid down by some of the learned com-
mentators: "The court of chancery will not permit the
application of infant's personalty for the benefit of his realty,
or to the purchase of realty, unless an arrangement can be

made preserving the rights of the personal represe'ntive in case the infant should die intestate, and leaving to the infant a disposing power over the property so applied as if it still continued in the shape of money." See Sto. Eq., Jur., § 1,357 and cases cited.

The reason of the rule is thus given by Lord Eldon in *Ex parte* Phillips, 19. Ves. 123 : " In the case of an infant it is settled, that, as a trustee out of court, cannot change the nature of the property, so the court, which is only a trustee, must act as the trustee out of court ; and finding that a change will be for the benefit of an infant, must so deal with it as not to affect the powers of the infant over his property even during his infancy, when he has powers over one species of property, not over the other."

Another reason is the one implied in the rule as laid down above, that it is manifestly inequitable to so exercise a trust for the benefit of an infant, as, where it can be avoided, to affect improperly the rights of parties who would otherwise be entitled to the fund. " It is," consequently, says Mr. Justice Story, " the constant rule of courts of equity to hold lands purchased by the guardian with the infant's personal estate, or with the rents and profits of his real estate, to be personalty, and distributable as such ; and, on the other hand, to treat real property (as, for example, timber cut down on a fee simple estate of the infant) turned into money, as still, for the same purpose, real estate.· * * And when the court directs any change of property, it directs the new investment to be in trust for the benefit of those who would be entitled to it, if it had remained in its original state." 2 Sto. Eq. Jur., § 1,357.

It is clear, therefore, that any change voluntarily made by a guardian or trustee will not be allowed to prejudice the ward or his representative, and even when the act is *ex necessitate* or so manifestly for the benefit of the infant that the court will confirm it, it will not be allowed to prejudice the representative of the infant, and a trust though not declared, to use the words of Lord Ch. King already quoted, " yet is'

in equity implied." It is equally clear that it is the rule of the court, when it authorizes a change, to declare the trust. Suppose the trust is not declared by the decree, will it, as in the case of changes without prior authority but subsequently confirmed, be "in equity implied?" Upon principle the answer must be in the affirmative. For, if the court will imply it, where the act is done without authority *and without declaring the trust*, when it sanctions the act, surely it ought to imply it if the act be done with authority, *but without declaring the trust*.

And to this conclusion Lord Eldon seems to have come in *Ware* v. *Polhill*, 11 Ves. 278, though the language attributed to him by the Reporter is singularly involved and obscure even for that learned judge. "I have uniformly made it a rule," he says, "since I have sat here, where property of one nature has been applied for the benefit of an infant to property of another nature, to have an express provision, that if he shall not attain the age at which he will have a disposable power, the representative shall not be prejudiced in any degree by the act done by the court in contemplation of the infant's benefit, in all the circumstances, surprise, or accident can throw around it. It is said this is the effect of the court's declaration; but if the court forgets to make that declaration the same rule does not obtain, and the court has disposed of the property by an imperfect judgment in another manner, and subject to different equities. *That is not correct*. For, the declaration is made because that is the law applicable to the case of an infant; *and it is of course to reform the order*. It does not create the right, but is a declaration of a pre-existing right so to have the property secured. Then the court in that determines no more than that the guardian or trustee ought to do so, and determines, therefore, that, if they do not do so, they act unduly by the infant."

In our American courts, the question of the effect of a conversion of an infant's personalty into realty upon the rights of the real and personal representatives seems never

to have arisen except in this state.    At least I have not been
able, in the limited investigation I have been able to give to
the question, to find a direct decision. ' But the converse
case of the effect of a conversion of realty into personalty
has been more or less considered by various state courts.
The decisions have generally turned, however, on local stat-
utes, or without any full discussion of the authorities except,
perhaps, in New Jersey.

In that state, the direct question arose in *Snowhill* v.
*Snowhitl*, 3 Green's Ch. 20, where the land of an infant had
been sold under a special act of the legislature, which had
been enacted on representations that such sale would be for
the benefit of the infant, and the infant died after the sale,
under age.    Chancellor Vroom, in a well considered opin-
ion, held that where property was lawfully changed in
character by the legislature, that the heir or next of kin must
take it as it actually exists, and that the proceeds of the
sale passed as personal property.    On appeal his ruling was
reversed by the Court of Errors in a decision not reported.
The question was again reviewed in *Oberle* v. *Lerch*, both by
Chancellor Zabriskie, 3 C. E. Green's Ch. 346, and by the
Court of Errors, 3 Id. 575, and the previous decision of the
Court of Errors adhered to upon principle, and because in
consonance with the weight of authority.    Upon principle,
because, to use the language of the Chief Justice in the Court
Errors, " it is a fixed principle of courts of equity never to
permit the property of an infant to be changed from personal
to real, or from real to personal, so as to affect the succes-
sion to it."    Citing 2 Atk. 413, and 1 P. Wm. 389.    And
because " such course is also eligible in respect to the cir-
cumstance that it removes all temptations from the relatives
of infants to endeavor, after a conversion of lands into
money, to divert them from the line of descent."    The
opinion of the Chancellor puts the latter objection more
pointedly :  " While it is the doctrine of this court," he says,
" that the property of an infant or lunatic must be managed
for the benefit of the owner only, and not for that of heirs

or next of kin, it is wise to hold that neither shall gain or lose by the change of its character; so that neither class will be tempted to procure a sale when it is not for the owner's benefit, or to defeat it when it would benefit him, as may, in the end, be for their own advantage. Some such persons generally have the management of the infant's estate; and, although the sale is ordered by the court, they have it in their power in these *ex parte* applications, so to place the matter before the court as to procure the decision they desire."

The case of *Oberle* v. *Lerch* was where there was a sale of land to pay the ancestor's debts, and the surplus was held to pass as realty, upon the death of the infant heir, and this whether the surplus arose from inadvertence, or from an express order of the court directing the whole land to be sold under a statute which authorized such an order when shown to be for the interest of parties. The Chancellor cites, among other cases, *Cooke* v. *Dealy*, 22 Beav. 196, and *Merick* v. *Bavier*, 6 Ire. Eq. 524, as directly in point.

In Maryland the courts, construing their own statutes, have held that a sale for partition or to pay the debts of the ancestor works a conversion of realty into personalty. *Hammond* v. *Stier*, 2 G. & J. 81, and *Jones* v. *Plummer*, 20 Md. 416. But the sale must be completed to work this result. *Betts* v. *Wort*, 3 Md. Ch. 113; *State* v. *Krebs*, 6 H. & J. 36.

In Pennsylvania, the decisions are conflicting. *Grider* v. *McClary*, 11 S. & R. 224, holds that the surplus of lands sold to pay ancestor's debts passes as personalty. *Dyer* v. *Cornell*, 4 Barr, 359, approves that decision, and extends it to the proceeds of infant's land legally sold by the guardian for the benefit of the ward. And in *Biggert* v. *Biggert*, 7 Watts, 563, a sale for partition was held to work a complete conversion. Subsequently *In re Tilghman*, 5 Whart. 44, the proceeds of infant's realty sold by virtue of an act of the legislature was held, on the death of the infant, to pass as realty. And in *Lloyd* v. *Hart*, 2 Barr, 473, the surplus proceeds of the land of a lunatic sold, by order of court, to

pay debts, was held to continue impressed with the character of realty.

In New York the only decisions seem to be in relation to the surplus proceeds of land sold to foreclose a mortgage, and they are directly in conflict, the last decision in point of time treating such surplus as realty, and the earliest decision having been decided without, apparently, any discussion of the question. *Bogart* v. *Ferman*, 10 Paige, 496 ; *Graham* v. *Dickinson*, 3 Barb. Ch. 170 ; *Sweazy* v. *Thayer*, 1 Duer. 286.

In Massachusetts, it was held in *Emerson* v. *Cutler*, 14 Pick. 108, that the sale of an infant's land, by license of the court, for the benefit of the infant, worked a conversion, and the proceeds passed as personalty.

In this state, it was held in *Roberts* v. *Jackson*, 3 Yer. 77, where an administrator took land in satisfaction of a debt due the intestate's estate, causing title to be made to the widow and child of the intestate, and the child died under age, that the administrator had no power to make the conversion, that the land must still be regarded as personalty, and that equity would divest the title out of the heirs of the infant and vest it in his distributees, or give the latter the benefit of the land as personalty.

By the act of 1827, ch. 54, the Court of Chancery was vested with authority to sell the land of heirs when it is so situated that partition thereof cannot be made, or when manifestly for the advantage of such heirs. By the 3d section of this act, it was made the duty of the court decreeing the sale, where there are minors, " to direct the manner in which the funds arising therefrom belonging to such minor shall be appropriated ; and if such court should deem it expedient, said court may direct that said moneys be laid out in the purchase of other lands for said minors." In *Rogers* v. *Clark*, 5 Sneed, 665, the question arose how the proceeds of lands sold under this statute should go, where the minor died without the court having given any direction as to the appropriation of the fund. The court held that : " The sale

of the land, if a proper case were made within the act of 1827, was, *proprio rigore*, an absolute conversion, notwithstanding the neglect of the court to provide for an appropriation of the fund. The proceeds of the land thereby became impressed with the character of personalty; and the court having failed to stamp it with a different character by directing its investment in other real estate, it must remain transmissible under the statute of distributions." To the same effect is *Curd* v. *Bonner*, 4 Cold. 632, where slaves were sold under order of court.

In *Jones* v. *Walkup*, 5 Sneed, 135, the contest was over the share of a married woman in the proceeds of the sale of realty under the same statute, and it was held that the confirmation of the report of sale worked a conversion of the realty into personalty, citing *Henderson* v. *Reid*, an unreported decision of the court, and *State* v. *Krebs*, 6 H. & J. 36. But the conversion is not complete until confirmation, and, in case of the death of the *feme* after sale, but before confirmation, the proceeds descend as realty. *Moore & wife, ex parte*, 3 Head, 171.

These decisions are clearly to the effect that where the sale of the property of an infant or *feme covert* is made under the authority of a statute, the sale, upon confirmation, works an absolute conversion.

The question still remains, suppose there is no statute authority, but the sale or change is made with the sanction of the court either by order in advance, or by ratification of an act of the guardian without order. This question was considered in *Singleton* v. *Love*, 1 Head, 357. There the guardian and mother of a female infant, at the request of the ward, then 19 years of age, sold a tract of land of the ward, and invested a part of the proceeds in other land. The ward married, and died under age. The husband, neither in the life-time of his wife, nor upon administering on her estate, dissented from or disaffirmed the transaction, but treated it as valid during his wife's life, and, after administration granted, received from the guardian a note for the

balance of purchase-money due for the tract of land of his wife which had been sold, and brought suit upon it. The only point authoritatively decided was that the transaction was an entirety, and was ratified by the act of the husband in appropriating to his use the note as aforesaid. The learned judge, however, Judge McKinney, the same who delivers the opinion of the court in *Rogers* v. *Clark*, 5 Sneed, 665, uses some general language on the subject under consideration which has been carried into our digests somewhat broadly. That eminent judge, after stating, as the general rule, that a guardian has no power, without the direction of a court of chancery, to convert the personal estate of an infant into realty, nor any power whatever to convert realty into personalty, adds : "That as respects the investment of an infant's money in land, the jurisdiction of changing the nature of the estate has been exercised by the court in cases where it was made to appear that it would be for the manifest benefit of the infant ; but, in the language of Lord Eldon, ' with this qualification that, if he lives, he may take it as real estate, but without prejudice to his right over it, during infancy, as personal property.' 17 Ves. 122. And, in some cases, the court has supported a conversion by the guardian out of court in investing the infant's money in land, where the circumstances were such that the court itself would have directed a like investment. But the infant, when he arrives at full age, will have his election to take the land or the money thus invested with interest. And if he dies under the age of twenty-one, his proper representative will have the right to treat the real estate purchased with the infant's money as personalty, and distributable as such."

This language implies that there is a clear distinction between a conversion by statute, and a conversion by the inherent power of the court. The former operates a complete conversion, while the latter leaves the property subject to the rights of parties, in the event of the infant's death, as if no change had been made.

In the meantime the Code made provision for the conver-

sion of the property of persons under disability. Section 3,223 *et seq*. The provision is literally for " a sale of the the property, real or personal " of such persons, but, as was held in *East Tenn. & V. R. Co.* v. *Love*, 3 Head, 63, 66, the provisions are broad enough to cover all changes of their property, even where it is taken, as in that case, by the exercise of the right of eminent domain. By § 3,338, the court is directed to see that the proceeds of sale are reinvested in the mode directed, and the property in which the investment is made," held in the same manner and subject to the same rules of descent and distributions as the property which was sold."

. This is a legislative declaration of the rule already adopted by this court, that no change of the property of a person under disability should be made by its order, or sanctioned, without providing that such change, in the event of the death of such person while still under disability, should not operate injuriously to his representative who would have taken if no change had been made. If the court omit to make the necessary order, "it is of course to reform it," according to Lord Eldon. *A fortiori*, will the statute operate in all cases within its equity to preserve such rights. The rule of the court now recognized by the statute seems to be eminently just and wise, for the reasons given by the courts of New Jersey, already quoted.

I am of opinion, therefore, that the change of the personal estate of complainant's children into realty, under the orders of this court, did not prejudice her right, upon their death under twenty-one, to have the land distributed as personalty.

To return to the question of improvements. It is well settled in this state that, where a party improves land, with a knowledge of a better title in another, he is not entitled, either in law or equity, to any diminution of the rents and profits by reason of said improvements. *McKinly* v. *Holliday*, 10 Yer. 477. And even where the person who has made the improvements has held in good faith, except under

a contract with the owner, or under such circumstances that the court will imply a contract, he is only allowed to set off against the claim for rents the permanent enhancement of the value of the property by reason of his improvements, but so that such allowance shall not exceed the rents and profits for which he is chargeable. Id. ; and *Jones* v. *Perry*, 10 Yer. 59. And see *Haggerty* v. *McCanna*, 25 N. J. Ch. 48.

Of course, the complainant must have known of the better title of her children, and she stands, therefore, in the class of persons who cannot claim for permanent improvements at all. And, were it otherwise, she could only recoup against the rents with which she is chargeable, the improvements to the extent of the rents actually received by her. However hard it may be, I do not see that I can allow her for any such improvements. The same rule must apply to her as to any other third person making such improvements. She should be allowed expenditures for ordinary and necessary repairs on all the realty, and the master should not be very rigid in construing what are ordinary and necessary repairs. The costs may abide the event of the report.